**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:14–cr–279–APG–VCF |
| vs. | **REPORT & RECOMMENDATION** |
| BRET ALAN HUMPHRIES, | MOTION TO SUPPRESS (#39) |
| Defendant. | |

This matter involves the United States' prosecution of Bret Alan Humphries. (Indict. #1[1]). Before the court is Mr. Humphries' Motion to Suppress (#39). The government opposed (#42); Mr. Humphries replied (#50); and both parties filed supplemental briefs (#62, #63). For the reasons stated below, the court recommends granting the motion.

### I. BACKGROUND

On August 30, 2012, Bret Humphries sat in his living room in Las Vegas reading the news as his stepdaughter, Alyssa Hart, talked on the phone with the father of her infant daughter. *See* (Tr. #54 55:1; 88:7–8). Bret's wife, Peggy Hart, slept in a nearby room. (*Id*. at 71: 21–22). Bret's infant granddaughter, Nala, was also home. (*Id*. at 57). It was approximately 110 degrees outside. (*Id*. at 25:15; 39:24).

As the family relaxed inside, a S.W.A.T. team assembled around their home. The team included two armored vehicles, a K-9 unit, 16 armored officers, two detectives from the Las Vegas Metropolitan Police Department ("Metro"), a forensic analyst, an investigative specialist, a sergeant, and an ambulance—in case "a gun fight" ensued. (*Id*. at 16; 27:23 –25). The team erected two perimeters around

---

[1] Parenthetical citations refer to the court's docket.

the home. (*Id*. at 10). An inner perimeter was designated for S.W.A.T. personnel only. (*Id*.) It contained armored vehicles and S.W.A.T. officers equipped with riot shields and guns. (*Id*.) Its task was to draw the family out of the home and detain them. (*Id*.) The outer perimeter was reserved for the K-9 unit, two detectives, forensic analyst, investigative specialist, sergeant, and ambulance. (*Id*.) Their initial task was to divert foot traffic and support the S.W.A.T. team. (*Id*.)

When both perimeters were established, S.W.A.T. Officer Giblin activated the PA system on an armored vehicle and commenced the operation against the family: "This is Las Vegas Metropolitan Police Department S.W.A.T. Team. We have a search warrant for the residence, address 4255 North Nellis Boulevard, building 7, unit 2052. Come out with your hands up. We have a search warrant." (*Id*. at 18:21–24). The team received no immediate response and repeated the call: "This is Las Vegas Metropolitan Police Department S.W.A.T. Team. We have a search warrant for the residence, address 4255 North Nellis Boulevard, building 7, unit 2052. Come out with your hands up. We have a search warrant." (*Id*. at 18:24–25; 55:8).

Alyssa Hart looked out a nearby window and saw the team assembled below. (*Id*. at 55:5). She rushed into the living room saying, "Dad, there's —!" (*Id*. at 55:7). But, Mr. Humphries was already outside. (*Id*. at 7–8). The front door was open and Mr. Humphries was standing alone on the balcony outside. (*Id*.) Alyssa heard the voice on the loudspeaker again, "Come out with your hands up." (*Id*.)

Mr. Humphries stood on his balcony in disbelief and asked, "Are you guys sure you got the right apartment?" (*Id*. at 88:17–18). Officer Giblin ordered Mr. Humphries out of the apartment. (*Id*.) Before leaving, he turned to Alyssa and said, "Get your Mom, get Nala, and come on downstairs." (*Id*. at 88:23–24). Alyssa woke her sleeping mother, gathered her shoes, and prepared to exit with Nala.

Mr. Humphries descended the stairs and saw an officer on one knee pointing "an M-16 or AR-15" at him. (*Id*. at 88:15). When he reached the bottom of the stairs, a voice on a bullhorn ordered him to turn

and walk backwards towards the S.W.A.T. team. (*Id*. at 89:1–5). He complied, walked backwards towards the voice, and had his hands zip tied behind his back. (*Id*.)

"What's going on?" he asked. (*Id*.) An officer said that it would be explained later, and escorted Mr. Humphries to the rear of an armored vehicle where another S.W.A.T. officer was waiting for him. (*Id*. at 89:6–9). The second S.W.A.T. officer took Mr. Humphries to the outer perimeter and gave him to two uniformed police officers who were standing between two patrol cars. (*Id*. at 89:10–13). Mr. Humphries asked, "What's going on?" (*Id*. at 89:16). An officer said that it would be explained later. (*Id*.)

Meanwhile, Alyssa, Peggy, and Nala, exited the family home. From the balcony, Alyssa saw a team of S.W.A.T. officers holding armored riot shields and a detective in a yellow jacket. (*Id*. at 56:4–7). Peggy saw guns pointed at her. (*Id*. at 72:20). They descended the stairs and were immediately separated from one another. (*Id*. at 73:4–7).

Peggy asked what was happening; a S.W.A.T. officer said that it would be explained later. (*Id*.) Her picture was taken and she was placed in an SUV. (*Id*.) She saw her daughter and granddaughter being escorted into another SUV on the other side of the perimeter; and then saw her husband standing with his hands zip tied behind his back a few feet away. *See* (*id*. at 73:8–11; 89:13). It was 110 degrees outside and his shirt was wet with sweat. (*Id*. at 31:1). Peggy began to feel discomfort and contacted an officer, telling him that she suffers from COPD, high blood pressure, and type 2 diabetes and does not cope well with the heat. (*Id*. at 31; 77:22–23).

Approximately forty minutes passed as the S.W.A.T. team entered the home and conducted a protective sweep. The family was told that they were not under arrest but that they could not re-enter their home without permission or a police escort. When the protective sweep was complete, the S.W.A.T. team departed and Alyssa, Peggy, Nala, and Mr. Humphries were taken back inside and ordered to sit on the living room couch, which had been "torn apart" by the S.W.A.T. team. (*Id*. at 30:14; 56:21; 74:1–7).

Detective Ramirez, Detective Darr, Forensic Analyst Matt Trafford, Investigative Specialist Lisa Rowe, and Sergeant Ryan Smith then commenced the search. (*Id.* at 91: 9–25). Around this time, Mr. Humphries' zip ties were removed. (*Id.*)

One officer blocked the front door and another engaged the family in small talk as the rest of the team took photos and scanned various digital devices. *See* (*id.* at 69:11; 91:10–13). None of the family members were allowed to walk around their home freely or retreat into a room without a law enforcement officer. *See* (*id.* at 28:24–29:2; 69:6–8). The family was expressly confined to the couch and did not feel free to leave. *See* (*id.* at 29:3 –7; 58:21–23).

At one point, Mr. Humphries asked if he could smoke a cigar in his home. *See, e.g.*, (*id.* at 57). He was told that he could not. (*Id.*) He asked if he could smoke a cigar outside on his balcony. (*Id.*) He was told that he could not. (*Id.*) At another point, Peggy asked if she could take her medication. (*Id.*) She was initially told, "You can't really move right now;" but was eventually escorted into the bedroom to retrieve what she needed. (*Id.* at 58:4 –9). At another point, an extended family member stopped by to remove Nala from the apartment. (*Id.* at 57:2 –6).

Then, Detective Ramirez approached the family and told Mr. Humphries that he wanted to speak with him privately. Mr. Humphries said that he "has nothing to hide, you can tell me here in front of my wife and daughter." (*Id.* at 93:5–7). Ramirez rejected Mr. Humphries' offer and insisted that Mr. Humphries be isolated from his family. (*Id.*) The family still did not know why their home had been intruded. (*Id.* at 93:5–10). Peggy urged her husband to go with Detective Ramirez "and find out what's going on." (*Id.* at 93:8–9). He complied.

Detective Ramirez took Mr. Humphries into a bedroom in the back of the apartment, told him to sit on the end of the bed, stood between him and the door, and began interrogating him. (*Id.* at 94). At

some point during the conversation, Detective Ramirez decided to record Mr. Humphries statements. (*Id*.) After Detective Ramirez turned the recorder on, Mr. Humphries incriminated himself.

Mr. Humphries now faces charges for the receipt and distribution of child pornography and moves to suppress all statements that he made to Detective Ramirez during the interrogation. On July 7, 2015, the court held an evidentiary hearing. (Mins. Proceedings #51). Detective Ramirez testified that he Mirandized Mr. Humphries; but that he did so before turning the recorder on. (Tr. #54 at 40:7–10). He also testified that he typically uses a *Miranda* card and waiver form; but he did not give Mr. Humphries a copy of the card or ask him to sign a waiver. (*Id*. at 40:15–22). Detective Ramirez also testified that the recording provides no indication that he "advised Mr. Humphries of his *Miranda* rights." (*Id*. at 41:8–10).

Mr. Humphries testified to a different set of facts. He stated that Detective Ramirez isolated him in the back bedroom and told him that *Miranda* does not apply to him when Mr. Humphries expressed concern about speaking with Detective Ramirez without an attorney. He testified:

> I asked him about my *Miranda* rights and he told me that I was not entitled to *Miranda*— I was not under arrest and so therefore *Miranda* did not apply to me. [. . .] I told Detective Ramirez, 'I don't think I should talk to you unless I have a lawyer present,' and he said, 'Well, since Miranda does not apply to you, you're not entitled to a lawyer.'

(*Id*. at 93:13–21).

On September 15, 2015, Mr. Humphries filed a letter with the court, complaining that Detective Ramirez allegedly authored a report that has not been produced in discovery. (Doc. #65). His attorney responded, saying that the letter was filed without his knowledge and that the government has fully complied with its discovery obligations. This report and recommendation follows.

## II. LEGAL STANDARD

The Fifth Amendment provides, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court held that the

5

Fifth Amendment requires law enforcement officials to advise a suspect of his right to remain silent and right to an attorney if the suspect is subjected to a custodial interrogation. 384 U.S. 436, 444 (1966). If law enforcement officials do not Mirandize a suspect during a custodial interrogation, the suspect's statements should be suppressed from the prosecutor's case in chief. *Id*. The government bears the burden of demonstrating compliance with *Miranda*. *See* 384 U.S. at 475; *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Colorado v. Connelly*, 479 U.S. 157, 158, 168–69 (1986).

*Miranda* warnings are designed to neutralize interrogation practices that prevent a suspect from making "a free and rational choice" about speaking. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (citing *Miranda*, 384 U.S. at 464–65). They achieve this goal by requiring the police to "adequately and effectively" advise suspects of the choices the Constitution guarantees. *Seibert*, 542 U.S. at 608 (citing *Miranda*, 384 U.S. at 467). "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." *Illinois v. Perkins*, 496 U.S. 292 (1990). The concern is "psychologically rather than physically oriented" because the "the modern practice of in-custody interrogation" involves the application of mental coercion. *Miranda*, 384 U.S. at 448.

In cases like this, where the suspect was not formally arrested or taken into police custody, the suspect is nevertheless considered "in custody" for *Miranda* purposes if he has been "deprived of his freedom of action in any significant way." 384 U.S. at 444. Since *Miranda*, the Supreme Court has enunciated several general definitions of custody, but the ultimate inquiry is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (quotation marks and citations omitted); *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (same).

The court engages in a three-step inquiry to determine whether a suspect was in custody. *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011) (citing *Keohane*, 516 U.S. at 112). First, the court examines

the totality of circumstances surrounding the interrogation. *J.D.B.*, 131 S. Ct. at 2402; *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). Second, the court considers whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Craighead*, 539 F.3d at 1082 (citing *Keohane*, 516 U.S. at 112). Third, "[o]nce the scene is set and the players' lines and actions are reconstructed," the court determines whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B.*, 131 S. Ct. at 2402 (citing *Keohane*, 516 U.S. at 112). The inquiry focuses on the objective circumstances; the subjective beliefs held by the interrogating officers and the person being interrogated are not germane. *Stansbury*, 511 U.S. at 322.

In *Craighead*, the Ninth Circuit identified four factors that are specifically relevant to determining whether an in-home interrogation is custodial: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. 539 F.3d at 1084. Deciding whether an in-home interrogation was custodial "is necessarily fact intensive." *Id.* (citing *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)).

### III.  DISCUSSION

Mr. Humphries' motion presents two questions: (1) whether the government's conduct during the search turned Mr. Humphries' home into a custodial setting that required *Miranda* warnings and, if so, (2) whether Mr. Humphries was Mirandized?[2] Both are discussed below.

---

[2] The parties do not dispute that Mr. Humphries was interrogated.

### A.     *Whether Mr. Humphries' Home was a Custodial Setting?*

Application of the Fifth Amendment to in-home interrogations "presents some analytical challenges." *Craighead*, 539 F.3d at 1082. "The home occupies a special place in the pantheon of constitutional rights." *Id.* at 1077. It is protected by the First Amendment, which prohibits the government from telling a person, sitting alone in his home, what he may read or watch. *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). It is protected by the Second Amendment, which prohibits a federal "ban on handgun possession in the home." *Dist. of Columbia v. Heller*, 554 U.S. 570, 128 (2008). It is protected by the Third Amendment, which forbids quartering soldiers "in any house" in time of peace "without the consent of the Owner." U.S. CONST. amend. III. It is protected by the Fourth Amendment, which protects the home from unreasonable searches and seizures. U.S. CONST. amend. IV.

Under the Fifth Amendment, a suspect's mere presence in his home during an interrogation is said to protect his freedom from the government's imposition of countervailing pressures. Home is where one's family resides, which provides moral support. *Miranda*, 384 U.S. at 450 ("[H]is family and other friends are nearby, their presence lending moral support."); *Elstad*, 470 U.S. at 315 ("The initial conversation took place at midday, in the living room area of respondent's own home, with his mother in the kitchen area, a few steps away."); *United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990) ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements.").

Home is familiar and comfortable, which provides shelter from psychological coercion. *See Orozco v. Texas*, 394 U.S. 324, 326 (1969); *Craighead*, 539 F.3d at 1083, 1088; *United States v. Brown*, 441 F.3d 1330, 1346–47 (11th Cir. 2006) ("[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as

the suspect's home.") (emphasis original). These features generally insulate a suspect from police coercion by neutralizing the pressures that would arise if the interrogation were to occur at the police station. *Craighead*, 539 F.3d at 1083 (citing 2 WAYNE R. LAFAVE, CRIMINAL PROCEDURE § 6.6(e) (3d ed. 2007)).

But, the home's protective effects greatly diminish when the home is the object of government scrutiny. The government's legitimate law enforcement needs (i.e., evidence preservation and officer safety) require police officers to temporarily dominate a home when executing a search warrant. *Michigan v. Summers*, 452 U.S. 692, 702 (1981) ("Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers."); *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) ("Searching investigators typically come armed and in groups of sufficient number to ensure officer safety."); *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011) ("Any warrant search is inherently police dominated; there is nothing untoward about that circumstance.").

When such dominance is exerted to secure the home, the situation can be custodial. *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (finding an interview custodial that occurred when dominance was asserted to secure a home to execute a search warrant); *United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002) (finding an interview custodial that occurred when dominance was asserted to secure a store to execute a search warrant).

Even after the home is secured, the search compromises the home's protective effects. A government search upends familiar surroundings; and occupants may be separated for a short period of questioning. *See Revels*, 510 F.3d at 1275 (citations omitted). A reasonable person is not likely to find comfort or shelter from psychological pressure in his home when a neutral magistrate judge has determined that it should be intruded because its contents are suspicious. *See Kim*, 292 F.3d at 974 (being confronted with evidence of guilt may render an interrogation custodial); *United States v. Hayden*, 260

F.3d 1062, 1066 (9th Cir. 2001) (same); *Lowe v. United States*, 407 F.2d 1391, 1397 (9th Cir. 1969) (same); *see also United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) (stating that the suspect and his family's loss of control over their home may render an interrogation custodial).

These objective circumstances place an occupant's Fifth Amendment rights in jeopardy. When police officers execute a search warrant in the home, there is a legitimate law enforcement need to dominate the home and temporarily detain and interrogate the occupants. *Summers*, 452 U.S. at 703–05. However, the existence of a valid search warrant under the Fourth Amendment does not obviate an officer's obligations under the Fifth Amendment. *Revels*, 510 F.3d at 1275; *Kim*, 292 F.3d at 977. If the police execute a search warrant and turn the home into a custodial setting, then the occupants must be Mirandized. *See id*.

If the police execute a search warrant inside a home and tell the occupants that they are free to leave, where will he go? "To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." *Craighead*, 539 F.3d at 1083 (citing *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004)). And if the occupants choose to stay, what will they do? Deduce that they should remain silent while unfamiliar government agents explain their presence, rummage through his belongings, scan their computers, and monitor their movements? This is unlikely. *See Summers*, 452 U.S. at 701–03; *Craighead*, 539 F.3d at 1083. The presence of a valid search warrant increases the probability that a reasonable occupant will make incriminating statements, especially if the occupant participates in the search. The decision not to Mirandize under these circumstances creates a hazardous grey zone.

No circuit court has held that an occupant must be Mirandized as a matter of course when the police execute a search warrant in the home. *See, e.g.*, *Williams*, 760 F.3d at 815 (stating that no bright-line rule exists); *Revels*, 510 F.3d at 1275 (stating that the inquiries under the Fourth and Fifth Amendment are separate); *Kim*, 292 F.3d at 977 (same). The First and Ninth Circuits have determined that the best

practice is to Mirandize the occupants and provide the prophylactic as they adjust to the psychological shock of the intrusion or postpone the interrogation until a non-custodial moment. *See Craighead*, 539 F.3d at 1086 (quoting *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)). This balances the suspect's "constitutional rights and the government's legitimate law enforcement needs." 493 F.3d at 40. And it produces an efficient result by obviating the court's fact-intensive determination of whether an in-home interrogation was, at some point, custodial. If best practices are not followed, the government gambles with the occupants' constitutional rights and the possibility that evidence will be excluded at trial.

   The government gambled here. It executed a search warrant in Mr. Humphries' home, failed to document the *Miranda* warnings Detective Ramirez testified were given, and created a police-dominated atmosphere that restrained Mr. Humphries' freedom of movement to the same degree associated with a formal arrest. The court's finding that Mr. Humphries' home was police dominated is supported by Detective Ramirez's testimony. On direct examination, he demonstrated that the situation was custodial because the family was detained on the couch and prohibited from moving:

> Q. Do you allow people to go all over your search location that are not law enforcement while you're doing a search?
>
> A. No.
>
> Q. Is it fair to say that you provide an area for them, if they wish to stay, that they can stay within?
>
> A. Yes.
>
> Q. [Where?]
>
> A. [T]heir living room couch. . . .

(Tr. #54 at 28:24–29:2). This constitutes custody. A person is considered "in custody" for *Miranda* purposes if the person has been "deprived of his freedom of action in any significant way." *Craighead*, 539 F.3d at 1082 (citing *Miranda*, 384 U.S. at 444). Here, Metro expressly confined the family to a disheveled couch. *See* (*id*.) They were allegedly told that they were free to leave; but "[t]o be 'free' to

leave is a hollow right if the one place the suspect cannot go is his own home." 539 F.3d at 1083 (citation omitted).

Detective Ramirez's testimony provides a sufficient basis to conclude that the setting was custodial and required *Miranda* warnings. This finding is also supported by the four *Craighead* factors. Each is addressed below.

### 1. The First *Craighead* Factor

The court first considers "the number of law enforcement personnel and whether they were armed." 539 F.3d at 1084. This factor strongly favors Mr. Humphries. When the operation was commenced, there were two armored vehicles, a K-9 unit, 16 armored officers carrying riot shields, two detectives from the Las Vegas Metropolitan Police Department, a forensic analyst, an investigative specialist, a sergeant, and an ambulance. (Tr. #54 at 16:6–14; 27:23 –25). When Mr. Humphries exited the home, he saw "an M-16 or AR-15" at him. (*Id*. at 88:15). When Peggy exited, she saw guns pointed at her. (*Id*. at 72:20). Metro S.W.A.T. Officer James Bonkavich testified that the S.W.A.T. officers wore ballistic helmets and flack jackets and carried various weapons, including rifles, handguns, riot shields, and low lethality weapons. (*Id*. at 17:10–11).

The government asserts that this factor weighs in its favor because the number of law enforcement personnel decreased when the search was executed.[3] The court disagrees. It is improper as a matter of law to treat the S.W.A.T. team's operation as something separate from the search. The Supreme Court directs lower courts to examine "the totality of circumstances surrounding the interrogation," *see J.D.B.*, 131 S. Ct. at 2402, not the immediate circumstances surrounding the interrogation. Additionally, it would be unreasonable to treat the S.W.A.T. team's actions as separate from the conduct of the searching officers.

---

[3] When the search was commenced, there were two detectives from the Las Vegas Metropolitan Police Department, a forensic analyst, an investigative specialist, a sergeant. (Tr. #54 at 27:23–25).

A reasonable person would view the operation as a single event and would be under the psychological effect of the S.W.A.T. team's show of force long after the team had departed.

Even if the court were to view the in-home search as an isolated event, the court would still find that the circumstances were custodial. In *Craighead*, the Ninth Circuit stated that "when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out." 539 at 1084–85. Here, Mr. Humphries testified that he believed he would have been stopped if he had attempted to leave because "at all times there was an officer between me and every door, except for the sliding glass door. When we went into the bedroom to talk, Ramirez instructed me to sit on the end of the couch – or bed and he stood between me and the door." (*Id.* at 94:11–15).

These circumstances parallel *Craighead*. There, Mr. Craighead was taken into a backroom for questioning where a detective appeared "to be leaning with his back to the door in such a way as to block Craighead's exit from the room." 539 F.3d at 1086. The detective wore a flack jacket or raid vest, and was visibly armed. So too here. Mr. Humphries was taken into a back bedroom and Detective Ramirez blocked his exit while wearing a bright yellow S.W.A.T. jacket and a gun.

    2.  <u>The Second *Craighead* Factor</u>

Second, the court considers "whether [Mr. Humphries] was at any point restrained, either by physical force or by threats." *Craighead*, 539 F.3d at 1084. This factor also favors Mr. Humphries.

Actual restraint is not required to find that a person is in custody for *Miranda* purposes. *See Orozco*, 394 U.S. at 325, 327 (finding custody where four officers entered the suspect's bedroom and acted as though he was "not free to leave," but did not actually handcuff or physically subdue the suspect). In *Craighead*, the court determined that a suspect was restrained where (1) he "was not handcuffed or physically restrained," (2) he "was escorted to a back storage room and the door was closed behind him,"

(3) a detective appeared to be blocking the suspect's exit from the room, (4) the detective was armed and wearing a flack jacket, and (5) the suspected testified that he was not free to leave. 539 F.3d at 1086.

Each of these facts are present here. Although Mr. Humphries was restrained at the beginning of the search, his zip ties were removed when he was interrogated. Like *Craighead*, Mr. Humphries was escorted to a back room and his exit was blocked. Like the detective in *Craighead*, Detective Ramirez wore a bright yellow S.W.A.T. jacket and a gun and blocked Mr. Humphries' exit with his body. Also like *Craighead*, Mr. Humphries testified that he did not feel free to leave:

> Q. Did you feel that you were free to get up and leave during this search of your place?
>
> A. Not at all.

(Tr. #54 at 94:20–22).

Additionally, the totality of the circumstances demonstrates that Metro's actions created objective circumstances that would lead a reasonable person to believe that Mr. Humphries was restrained. Metro descended on his home with two armored vehicles, a K-9 unit, 16 armored officers, two detectives from Metro, a forensic analyst, an investigative specialist, a sergeant, and an ambulance. (*Id*. at 16; 27:23 –25). That Metro's conduct restrained Mr. Humphries is further supported by the fact that neither Peggy, Alyssa, nor Mr. Humphries left with Nala when a relative came to retrieve her.

### 3. The Third *Craighead* Factor

The court next considers whether Mr. Humphries was isolated from others. *Craighead*, 539 F.3d at 1084. This factor strongly favors Mr. Humphries.

It is well settled that separating a suspect from his family for questioning is a custodial-type restraint. *See Miranda*, 384 U.S. at 450 (quoting a manual on police interrogation stating that the presence of family lends the suspect moral support and inhibits the officer's psychological advantage); *Elstad*, 470 U.S. at 315 (finding an interrogation noncustodial because a family member was in the next room); *Griffin*,

922 F.2d at 1352 ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements.").

It is equally well settled that a custodial setting is more likely to be found when the police remove and isolate a suspect from the room of his or her choosing. In *Miranda,* the Supreme Court cited a police manual that instructed officers how to establish a custodial setting that would likely induce incriminating statements: "[i]f at all practicable, the interrogation should take place in the investigator's office or *at least in a room of his own choice*." 384 U.S. at 449 (citing INBAU & REID, CRIMINAL INTERROGATION AND CONFESSIONS 99 (1962)) (emphasis added).

Here, Detective Ramirez isolated Mr. Mr. Humphries from his family and deprived him of the room of his own choosing. All of the witnesses testified that Mr. Humphries wanted to stay in the living room with his family but Detective Ramirez rejected Mr. Humphries express desire and insisted that he be isolated from his wife and daughter in the bedroom. *See, e.g.*, (Tr. #54 at 93:5–7). By isolating him from his family, Detective Ramirez eliminated the moral support that is crucial to a suspect's ability to withstand coercion. *See Craighead*, 539 F.3d at 1087 (citing *Miranda*, 384 U.S. at 445–46) ("[T]he Supreme Court was explicit that the law enforcement technique of isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation.").

    4.    The Fourth *Craighead* Factor

Fourth, the court considers "whether [Mr. Humphries] was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *Craighead*, 539 F.3d at 1084. "If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody." *Id*. at 1089 (citing *Griffin*, 922 F.2d at 1349). However,

the mere recitation of the statement that the suspect is free to leave does not render an interrogation non-custodial *per se*." *Id*. The court "must consider the delivery of these statements within the context of the scene as a whole." *Id*. (citing *United States v. Lee*, 699 F.2d 466, 467–68 (9th Cir. 1982) (per curiam)).

Here, Detective Ramirez testified that he told Mr. Humphries that he was free to leave; but the context of the statement demonstrates that Mr. Humphries was not free to leave. Detective Ramirez told Mr. Humphries that he was free to leave immediately after the S.W.A.T. team demonstrated an impressive show of force that involved two armored vehicles, a K-9 unit, 16 armored officers, two detectives from the Las Vegas Metropolitan Police Department, a forensic analyst, an investigative specialist, a sergeant, an ambulance, and guns that were pointed at him and his wife. A reasonable person would not believe that he or she is free to leave in light of the overwhelming power that was exerted over Mr. Humphries, his family, and his home.

The officers' positions within the home also demonstrate that the context of the statement was custodial. Mr. Humphries testified that he was surrounded by police officers who blocked every exit: "at all times there was an officer between me and every door, except for the sliding glass door. When we went into the bedroom to talk, Ramirez instructed me to sit on the end of the couch – or bed and he stood between me and the door." (*Id*. at 94:11–15). Detective Ramirez's statement that Mr. Humphries was free to leave was insufficient to counteract the objective custodial circumstances within which the statements was uttered.

Third, the combination of the heat and Peggy's medical condition created a custodial context. Everyone testified that it was at least 110 degrees outside. *See* (Ramirez Test. #54 at 25:15) ("It had to be at least 110."). Mr. Humphries shirt was wet with sweat, *see* (*id*. at 31:1), and Peggy testified that she was medically unable to leave the apartment because of the heat, *see* (*id*. at 46:1–5; 77:22–25). These facts provided Detective Ramirez with actual knowledge that Mr. Humphries could not leave his home.

### B.      *Whether Mr. Humphries was Mirandized?*

Because the court finds that Mr. Humphries was in custody, it must consider a second question: whether Detective Ramirez Mirandized him when he took Mr. Humphries into the bedroom for an interrogation? The court finds that the government failed to satisfy its burden showing that Mr. Humphries was Mirandized.

Other than Detective Ramirez's testimony, there is no evidence Mr. Humphries was Mirandized. During the court's evidentiary hearing, Detective Ramirez testified that he Mirandized Mr. Humphries; but he also stated that he did so before he decided to record Mr. Humphries' incriminating statements. *See* (Tr. #54 at 40:7–10). Detective Ramirez also stated that he typically uses a *Miranda* card and waiver form, but he did not give Mr. Humphries a copy of the card or ask him to sign a waiver in this case. (*Id*. at 40:15–22). On cross examination, Detective Ramirez conceded that the recording contains no indication that he "advised Mr. Humphries of his *Miranda* rights." (*Id*. at 41:8–10). In direct contradiction to Detective Ramirez's testimony, Mr. Humphries testified that he was not Mirandized:

> I asked him about my *Miranda* rights and he told me that I was not entitled to *Miranda*—
> I was not under arrest and so therefore *Miranda* did not apply to me. [. . .] I told Detective Ramirez, 'I don't think I should talk to you unless I have a lawyer present,' and he said, 'Well, since Miranda does not apply to you, you're not entitled to a lawyer.'

(*Id*. at 93:13–21).

The court finds Mr. Humphries' testimony on this point more credible than Detective Ramirez's testimony. A police detective interrogates suspects as a regular job activity. Confusing details of successive interviews is a real possibility. For this reason, officers typically record *Miranda* warnings if recording equipment is available (as was the case here), or at a minimum, have the suspect sign a card acknowledging that he received the *Miranda* warnings.

Mr. Humphries description of his discussion about *Miranda* rights as they were entering the bedroom was highly credible. There is no doubt that Mr. Humphries' experience that day was anything but routine. The court finds that Mr. Humphries accurately testified regarding what was said by Detective Ramirez and Mr. Humphries regarding *Miranda* warnings on August 30, 2012.

The circumstances of Mr. Humphries' interrogation show that Detective Ramirez had every opportunity to memorialize whether he Mirandized Mr. Humphries. The circumstances were not emergent; Detective Ramirez is not inexperienced; Mr. Humphries was not a flight risk; and Detective Ramirez was not without support staff. However, the government provided no explanation for Detective Ramirez's failure to document his version of the facts. Under these circumstances, the court finds that the government failed to meet its burden of demonstrating compliance with *Miranda*.[4]

Therefore, the court recommends granting Mr. Humphries' Motion to Suppress and excluding his statements from the government's case in chief. *See Miranda*, 384 U.S. at ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."); *Harris v. New York*, 401 U.S. 222 (1971) (holding that confessions obtained in violation of *Miranda* may be used for impeachment purposes).

ACCORDINGLY, and for good cause shown,

IT IS RECOMMNEDED that Mr. Humphries' Motion to Suppress (#39) be GRANTED.

IT IS ORDERED that Mr. Humphries' Letter (#65) is STRICKEN. *See* LR IA 10-6(a) ("A party who has appeared by attorney cannot while so represented appear or act in the case.").

---

[4] Because Mr. Humphries was subjected to a custodial interrogation and was not *Mirandized*, the court does not reach the question of whether or not he invoked his right to counsel.

DATED this 24th day of September, 2015.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE